Gladys **WOODS,** Plaintiff-Respondent,

v.

**STANDARD PERSONAL LOAN PLAN, INC.,** a Corporation, Defendant-Appellant.

No. 32607.

St. Louis Court of Appeals.

Missouri.

Sept. 19, 1967.

As Modified Oct. 17, 1967.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 17, 1967.

Hinkel & Carey, Clifford L. Goetz, W. Scott Pollard, St. Louis, for defendant-appellant.

Gregg W. Keegan, St. Louis, for plaintiff-respondent.

BRADY, Commissioner.

Plaintiff received judgment for $2,200.00 actual and $7,000.00 punitive damages in her action for malicious prosecution of a civil action. Defendant appeals contending the trial court erred in denying its motion for a directed verdict offered at the close of all the evidence and in refusing to give an instruction offered by it. Defendant also contends both the actual and punitive damages awarded are excessive.

In those parts pertinent to this appeal plaintiff's petition alleged defendant harassed her and threatened her with legal action; that defendant willfully and maliciously filed a false and fraudulent suit against plaintiff when defendant "* * * knew or in the exercise of ordinary care should have known that the suit was ill founded and that plaintiff was not indebted unto said defendant." It was further alleged that as a result of defendant's acts plaintiff suffered damage to her reputation, lost earnings in the amount of $150.00 and suffered "great humiliation and embarrassment" to her damage in the amount of $2,500.00. By Count II of the petition, plaintiff prayed for punitive damages in the amount of $15,000.00. The answer was a general denial.

█ We are required by the jury's verdict to state the facts in the light most favorable to plaintiff. Huffstutler v. Coates, Mo., 335 S.W.2d 70. Doing so it appears from the record that on August 9, 1958, defendant made a loan of $264.75 to be repaid by eighteen consecutive installments of $18.00 each. The note evidencing

this loan was signed by "Charles D. House" and plaintiff with House was designated on the note as "Borrower". On December 9, 1958, this note, as defendant's witnesses put it, was "renewed". This renewal was in the form of a new note for the balance then due upon the old note plus an unspecified amount of additional money paid to House bringing the indebtedness to $350.65. It was defendant's practice, and it was followed in this instance, to show only the principal sum due on the face of the note, the interest being computed at each payment and paid separately. Accordingly, Exhibit B, a note for $350.65, was made out. It was to be paid in twenty-four consecutive payments of $24.00 each and again bore the signature of "Charles D. House" as "Borrower". Whether plaintiff signed this note is in dispute. Her name appears thereon opposite the signature "T. Nelson" who also witnessed House's signature.

House, plaintiff's nephew, became ill early in 1959 and plaintiff started making payments. However, she considered she was making payments upon the first note and so informed defendant. She did not notice that on some of the receipts she received the balance noted was larger than the amount due on the note of August 9, 1958. She continued making payments until May or June of 1960. Her testimony was that although she paid the note of August 8, 1958, in full she never received the cancelled note nor any other evidence it had been paid.

About three weeks or "maybe a month" after she made the last payment she began hearing from the defendant. She was then working at Kalmon Shoe Company where she had been employed for over thirty years at a wage of $14.00 per day for an eight hour day. She received five or six telephone calls from defendant's employees and each time was required to leave her work and go to the office to converse with defendant's employees about her payment of this note. This had never happened to her before in her life. Later, "They sent me a letter and I went to the (defendant's) office

and I told them that I thought the loan was paid off and they said, well, this amount yet, balance, and I said, well, it couldn't be that much because I had already paid off that much and that was more than the loan was at the beginning. They told me, well, this was the second loan that he made." She further testified that she informed defendant that she did not sign the note of December 9, 1958, and was not going to pay it. Upon several occasions when she was at defendant's office to see them about this matter she asked to see the note and was told the person in charge of such matter was out and so she could not see it. She was told that if she did not make payments her wages would be garnisheed.

In May of 1960, plaintiff's attorney wrote defendant stating the signature on the note of December 9, 1958, was not that of the plaintiff and offered to have plaintiff sign an affidavit to this effect. He further suggested the signature might have been placed on the note by House. In July of that year, plaintiff's attorney received a letter from defendant stating: "Regarding our telephone conversation I am sending a photostatic copy of the note. You state that this is not the signature of Mrs. Woods. Please have an affidavit obtained. Gilbert Kay." Five days later plaintiff executed the following affidavit: "I did not co-sign a note with Charles D. House for the Standard Personal Loan Plan, which note is signed Charles D. House and Gladys Woods, dated December 9, 1958, in the principal amount of $355.55. I further state I have examined a photo copy of this note which bears the signatures Charles D. House and the signature Gladys Woods and I hereby state under oath that the signature appearing on behalf of the above mentioned note is not my signature and that I did not sign same." Later that same month, plaintiff's attorney wrote a letter to defendant stating that he had in his possession this affidavit but he was " * * * somewhat reluctant to furnish you this Affidavit since there may be some criminal prosecution of this boy. However, if you care to have a

representative of the bonding company call at my office, I will be glad to further discuss this matter with him." Defendant made no effort to see the affidavit at plaintiff's counsel's office or to pursue the matter further with him.

In November of 1960 defendant filed suit in Magistrate Court against plaintiff seeking recovery of $257.04 plus interest which was alleged as the balance due on the note of December 9, 1958. Plaintiff was served while she was at work and had to come to the office of her employer for that purpose. Her fellow employees and her employer made some comments to her about the matter but what was said does not appear in the record. Trial of that cause resulted in judgment being rendered in favor of Mrs. Woods. Defendant did not appeal that decision.

Lester Caplan, defendant's President, testified the "counter work" on the loan of December 9, 1958, was handled by Tod Nelson, a trainee then with the defendant and who was in Kenosha, Wisconsin at the date of the trial of this case. Caplan testified he approved the loan in the presence of House and the plaintiff but admitted he did not see the plaintiff sign this note nor did he see to whom the additional money was paid. When the loan was made a credit life insurance policy on House was taken out and plaintiff was named as the beneficiary. Defendant also introduced into evidence its Exhibit D, an "Application and Financial Statement", bearing the signature "Gladys Woods" and witnessed by "T. Nelson". This statement bears the date of December 9, 1958. Plaintiff denied signing such a statement.

The defendant's witness Wachter was given defendant's Exhibits A, B, and C for the purpose of giving an opinion whether the signature "Gladys Woods" appearing on each was written by the same person. "A" was a piece of paper upon which plaintiff had signed her name five times; "B" was the note of December 9, 1958, which she denied she signed; and "C" was the note

of August 9, 1958, which plaintiff admitted signing. His testimony was: "That the party who had applied the signatures on A, and B, was a different party than had applied the signature on Exhibit C."

The nature of defendant's allegations of error renders unnecessary a recitation of the evidence as to its financial status. The evidence of plaintiff's out-of-pocket loss showed she was off work five times for a half day each and also missed one full day when the case was tried in the Magistrate Court. She had to pay a $75.00 attorney's fee. In November of 1964 she quit her job and went to work with another company.

It appears from the record that the deposition of Charles House was taken at the same time as was plaintiff's. For some unexplained reason House was not a witness nor was his deposition or any part of it read into evidence. At the date of the trial of the malicious prosecution action House had fully paid the note of December 9, 1958.

Defendant offered and the court refused to give the following instruction which is admittedly not taken from M.A.I.: "Your verdict must be for the defendant if you believe: The plaintiff signed the promissory note dated December 9, 1958, in the sum of $350.65, made payable to the defendant and introduced into evidence as Defendant's Exhibit "B"." The trial court did give Instruction No. 4 which informed the jury that their verdict must be for the defendant if they believed that at the time of the institution of the Magistrate Court action against plaintiff defendant had reasonable grounds to believe plaintiff had executed defendant's Exhibit B.

■ It is important to keep clearly in mind what is not involved in this appeal. The general principle governing an action to recover for a wrongful initiation of a civil proceeding is stated in the Restatement of the Law, Torts, § 674, at p. 440. It is there stated that one who initiates or pro-

cures the initiation of a civil proceeding against another is liable for the harm done thereby if (1) the proceedings are initiated without probable cause, *and* (2) primarily for a purpose other than securing the adjudication of a claim on which the proceedings are based, and (3) the proceedings have terminated in favor of the person against whom they are brought. In the instant appeal there is no question but that the Magistrate Court's proceedings brought by the defendant were terminated in favor of the plaintiff. As earlier stated, one of the issues in this appeal is whether the defendant initiated the Magistrate Court proceedings without probable cause. No issue with regard to the other requirement, (2) above, is presented in this appeal. However, those interested may refer to Restatement of the Law, Torts, Chapter 30, § 676. Similarly it must be kept in mind, with reference to the point raised herein as to the existence of probable cause, there is no issue as to whether defendant acted upon the advice of counsel and whether such advice was given under such conditions (full disclosure of the facts, etc.) as would constitute a defense for the defendant. See Restatement of the Law, Torts, Chapter 30, § 675; ibid., Chapter 29, § 666.

Defendant first contends the trial court erred in refusing to sustain its motion for directed verdict offered at the close of all the evidence and in support thereof alleges plaintiff failed to prove want of probable cause. "Probable cause is defined in 54 C.J.S. Malicious Prosecution § 22, as follows: 'Probable cause in civil proceedings consists of such facts and circumstances as will warrant a cautious, reasonable and prudent man in the honest belief that his action and the means taken in prosecution of it are just, legal, and proper.' * * * 34 Am.Jr.P., Malicious Prosecution, page 732, defines want of probable cause in the following words: 'With reference to civil actions, probable cause has been said to be such reason supported by facts and circumstances as will warrant a cautious man

in the belief that his action and the means taken in prosecuting it are legally just and proper.' * * *" And in 54 C.J.S. Malicious Prosecution § 97, at page 1088, it is said: "The question of probable cause in actions for malicious prosecution is solely for the determination of the court where the facts relied on are admitted or undisputed and only one inference can be drawn therefrom."

■ We cannot agree that the facts as to this issue were undisputed. Neither can we agree the only inference to be drawn from them is one which would require the trial court to sustain defendant's motion for a directed verdict. Defendant did have a note in its possession which bore the signature "Gladys Woods" but its officers were also cognizant of the fact she denied this was her signature and had in fact made a sworn statement to that effect which they could have seen had they been inclined to do so. Defendant must also be held to know that Mr. Caplan did not see plaintiff sign this note nor did he see her receive any of the additional money paid when the note was signed. Under these circumstances the jury could well find a cautious, reasonable, and prudent person would take other steps to insure the Magistrate Court action was in fact brought against the proper party. Defendant places great reliance upon the fact plaintiff made payments after the second note was executed and received receipts upon which the balance stated as due was so in excess of the original balance due upon the August note as to warn plaintiff the payments could not in fact be upon that note. Plaintiff's explanation was that she did not notice the balances on the receipts and informed the defendant that she was making payments upon the original note. The matter was therefore disputed and the jury could believe or disbelieve plaintiff's explanation. What defendant now seeks is to have us rule the issue of probable cause as a matter of law. To sustain its position we would have to say that reasonable minds could not arrive at any other

conclusion than that a cautious, reasonable, and prudent person must honestly believe plaintiff signed the note of December 9, 1958, and the action taken to collect the note was just, legal, and proper without any further inquiry by defendant. This we cannot do. Under the factual situation here presented the issue of probable cause was one upon which reasonable minds might well differ. It follows the trial court correctly ruled defendant's motion for directed verdict offered at the close of all the evidence.

Neither can we find any error in the trial court's action in refusing the offered instruction. Whether plaintiff had in fact signed the promissory note was not an issue in the malicious prosecution action. 54 C.J.S., supra; 34 Am.Jur., supra. That was an issue in the action brought upon the note in the Magistrate Court. For this reason it is unnecessary to further consider the testimony of the witness Wachter. His evidence went principally to whether plaintiff did in fact sign the note of December 9th. In this connection it might be said that the probative value of Wachter's testimony was very doubtful since it was contradictory to admitted facts which were agreed upon by both parties. In any event, Wachter's testimony was of no assistance to defendant as, if it had any probative value, it was that the person who signed the name "Gladys Woods" to the note which plaintiff denied signing was a different person than that who placed the same name upon the note which plaintiff admitted signing.

■ The issue involved in the malicious prosecution action was the presence or absence of probable cause. Kvasnicka v. Montgomery Ward & Co., 350 Mo. 360, 166 S.W.2d 503. Since there is no contention otherwise, we must assume this issue was correctly submitted to the jury when the trial court gave defendant's offered Instruction No. 4 informing them their verdict must be for defendant if they believed defendant had reasonable grounds to believe plaintiff had executed the note when it instituted the Magistrate Court action. The trial court properly refused the offered instruction.

The last two allegations of error deal with the damages awarded which are alleged to be excessive both as to actual and as to punitive damages. As this court has recently had opportunity to state (see Bertram v. Wunning, 417 S.W.2d 120, opinion filed May 16, 1967): "In Missouri excessive verdicts fall into two categories; i. e., (1) verdicts reflecting what has been characterized as 'simple excessiveness', and (2) verdicts reflecting excessiveness by misconduct. The first is the result of an honest mistake by the jury so that the sum awarded is disproportionate under the rule of uniformity. Errors of this nature should be cured by enforced remittitur thus avoiding the delay and expense incident to retrial. The latter type of excessive verdict usually savors of bias and prejudice engendered during trial. A verdict of this nature cannot be cured by remittitur and necessitates a new trial. Moore v. Glasgow, Mo.App., 366 S.W.2d 475, 1. c. 478, and cases there cited." As to actual damages defendant contends there was no testimony of actual damage except the loss of time and attorney's fees. With regard to punitive damages defendant contends the amount awarded, to quote from its brief: " * * * does not bear any real relationship to the injuries sustained" and is " * * * disproportionate to the amounts usually awarded for comparable injuries under the rules of uniformity." It is therefore clear defendant's allegations of error with regard to excessiveness fall within that category which has been referred to as "simple excessiveness". Since we are bound on appeal by the issues raised by defendant in its brief, it follows that if we sustain defendant's contentions with regard to excessiveness it would not be necessary to order a new trial. Bertram v. Wunning, supra; Moore v. Glasgow, supra.

As has been stated previously herein the only evidence of actual out-of-pocket loss suffered by the plaintiff can be computed at a total of $124.00 on the basis of a loss of one full day at $14.00, five half-days at $7.00 each, and an attorney's fee of $75.00. However, it is well settled that in an action for malicious prosecution actual damages can include injury to reputation, mental and physical suffering caused thereby, and the general impairment of social standing. Foley v. Union House Furnishing Co., 228 Mo.App. 1063, 60 S.W. 2d 725; 54 C.J.S. Malicious Prosecution § 112, p. 1103; Restatement of the Law, Torts, Chapter 30, § 681. (An early and probably the leading case in this jurisdiction on the subject is Walser v. Thies, 56 Mo. 89.) Comment (b) following § 681 of Chapter 30 of the Restatement of Torts makes clear the distinction between damages recoverable in an action for wrongful initiation of civil proceedings and those recoverable where the proceedings wrongfully initiated are criminal. " * * * The accusation of criminal misconduct carried to the point where criminal proceedings are instituted is of itself defamatory and, therefore, the mere bringing of criminal proceedings is assumed to have caused injury to the reputation of the accused." Restatement, supra, § 681. "Thus, the plaintiff may recover for such injury to his reputation as normally results from the publication of the accusation without proving that his reputation has been lowered. So too, a plaintiff may recover damages for the distress which normally results from being prosecuted for a crime without proving that he has suffered any emotional disturbance." See Restatement of the Law, Torts, Wrongful Prosecution, Chapter 29, § 670, p. 429. A wrongfully initiated civil action is not in itself defamatory to the person against whom the proceedings are brought. It depends upon the matters alleged in the action. Quoting from Comment (b), p. 461, Restatement of Torts, supra: " * * * In a word, the test is whether the defendant's pleadings

are such that if not protected by the privilege of a litigant (see § 587) they would be actionable under the rules which govern recovery for defamation." The examples given in the Comment hypothesize an action brought to determine the ownership of land claimed in good faith by both parties as contrasted to an action based upon the alleged fraudulent conduct of a defendant. The former does not carry with it the defamatory implication inherent in the latter. The result would be that in the latter case the plaintiff in the suit for malicious prosecution of a civil action would be in the same position as to proof of damages as if a criminal prosecution had been wrongfully instituted against him and would not have to submit further proof in order to recover damages for the harm to his reputation or to the distress which he suffered. In the former case he would have to submit such proof. The Magistrate Court action which formed the basis for plaintiff's action for malicious prosecution falls clearly within the former category and contains no defamatory implication per se. Accordingly, plaintiff must submit further proof of damage to her reputation and of her mental suffering and embarrassment in order to sustain the difference between her out-of-pocket expenses of $124.00 and the $2,200.00 awarded by the jury.

In this connection her evidence that when she was served with process her fellow employees and her employer made some "comments" has no probative value. The nature of the comments made was not stated and the jury was left to speculate as to them. Such evidence is as susceptible to the inference that the comments made were unfavorable to defendant as it is to the inference the comments were unfavorable to plaintiff with the result that this testimony becomes valueless.

Plaintiff's evidence she continued to work at her place of employment until November of 1964 when she "quit" to accept work with another company is of no assistance to her. When we recall that she did not change employment until No-

vember of 1964 although her troubles with defendant began in May or June of 1960, the more reasonable inference is that her change of employment was due to reasons other than her troubles with defendant.

The transcript does disclose that plaintiff was called to the telephone upon numerous occasions while at work and the jury could infer that in the hearing of her employer and the office employees she had to converse with defendant's employees as to why she hadn't paid this note; that she was threatened with having a garnishment run upon her wages; and that this never happened to her before. In addition, there is the evidence from which the jury could infer conversations of this same nature took place in defendant's office in the presence of its employees and whomever might be within hearing. The record is devoid of any testimony by her that she was embarrassed or of any other statement by her which, giving her the benefit of all reasonable inferences as we must do, can be said to support her contention there is ample evidence to support the award for actual damages. Plaintiff relies upon Foley v. Union House Furnishing Co., supra, but the distinction between the evidence in Foley and that in the instant case is obvious. In Foley the plaintiff testified he was very much humiliated because he was told in the presence of twenty to forty other employees that his wages had been garnisheed and because his foreman stated publicly in the hearing of the other employees that he "wanted to know why in the hell I didn't pay my bills."

An allegation of "simple excessiveness" encompasses a situation where the verdict is not supported by the evidence. Connoley v. Beyer Crushed Rock Co., 355 Mo. 684, 197 S.W.2d 653, 1. c. 656 [7, 8]; Moore v. Glasgow, supra. This is the situation in the instant appeal. It follows that defendant's contention with regard to the excessiveness of the award for actual damages must be sustained.

■ We pass now to defendant's contentions with regard to the excessiveness of the verdict as to punitive damages. With regard to the contention the award for punitive damages should be found excessive " * * * under the rules of uniformity" we hold that this contention is without merit. It is well settled that whether punitive damages are to be awarded is largely a matter within the discretion of the jury who are to keep in mind the nature of the wrong committed and such aggravating circumstances as may be shown rather than the measure of compensation to plaintiff. 54 C.J.S. Malicious Prosecution § 114, p. 1106. In the same work at § 115 it is stated that the jury are the proper judges of the amount of punitive damages to be awarded and the verdict will not be disturbed unless their determination appears to have been influenced by some passion, prejudice, or other improper motive. As previously stated, defendant does not raise any contention of passion or prejudice but contents himself with an allegation of "simple excessiveness".

■ With regard to the contention this award does not bear any real relationship to the injuries sustained, we rule that contention against defendant. It has often been said the amount of punitive damages awarded should bear some reasonable proportion to the injury sustained but such a general statement is of little value as a guide. In State ex rel. St. Joseph Belt R. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351, an award of $4,000.00 punitive damages was allowed to stand although the verdict for actual damages was only $1.00. It requires no citation to sustain the proposition that punitive damages rest upon a different basis than do actual damages which are compensatory in nature. We find nothing in this record compelling us to disturb the jury's verdict as to punitive damages.

It follows the judgment should be reversed and the cause remanded to the trial court with directions that it enter its judg-

ment in favor of plaintiff and award her actual damages of $124.00 and punitive damages in the amount of $7,000.00.

PER CURIAM:

The foregoing opinion by BRADY, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded to the trial court with directions that it enter its judgment in favor of plaintiff and award her actual damages of $124.00 and punitive damages in the amount of $7,000.00.

RUDDY, Acting P. J., SAMUEL E. SEMPLE, Special Judge, and WOLFE, J., concur.